**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

*In re* **N.C.-1, N.C.-2, and S.C.**

**No. 21-0192** (Kanawha County 20-JA-218, 20-JA-219, and 20-JA-220)

**MEMORANDUM DECISION**

Petitioner Mother K.S., by counsel Anna L. Butcher, appeals the Circuit Court of Kanawha County's January 28, 2021, order terminating her parental rights to N.C.-1, N.C.-2, and S.C.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Patrick Morrisey and S.L. Evans, filed a response in support of the circuit court's order and a supplemental appendix. The guardian ad litem, Sharon K. Childers, filed a response on behalf of the children in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred by (1) denying her a post-adjudicatory improvement period; (2) denying petitioner's request for in camera interviews of the children; and (3) terminating her parental rights.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In May of 2020, the DHHR filed an abuse and neglect petition against petitioner alleging that she engaged in substance abuse, failed to properly supervise the children, caused them educational neglect, and failed to provide them other necessities such as food and adequate housing.[2]

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990). Additionally, because two of the children share the same initials, we will refer to them as N.C.-1 and N.C.-2, respectively, throughout the memorandum decision.

[2]The DHHR's petition also included allegations of abuse and neglect against S.B. and K.B., petitioner's older children. However, they have since reached the age of majority and are not at issue on appeal.

The DHHR further alleged a lengthy history of interactions between petitioner and Child Protective Services ("CPS"). According to one referral, K.B., an older child not at issue on appeal, had a "youth services case" at the time. Further, the referral indicated that petitioner "reportedly ha[d] a 'white powder' in a car in a yellow envelope." Petitioner had also reportedly been staying out late consuming alcohol and, on one occasion, she came home on a Tuesday at 5:00 am and had to be carried to bed by her older children. The referral also indicated that petitioner was often absent from the home and petitioner did not regularly provide enough food for the children. The DHHR also alleged that petitioner was provided many services, including adult life skills and parenting classes, over the years with no change in the home. Specifically, the DHHR indicated that petitioner was provided with parenting services in 2005; adult life skills and parenting classes in 2006; parenting classes in 2012; and cases were opened and later closed in 2013 and 2014 after petitioner refused to participate with CPS. The DHHR alleged that the case was reopened in 2016 and remained open but petitioner again refused services. As a result, the DHHR alleged that the CPS records demonstrated that petitioner left her children home alone throughout the years, leading to two children with youth services cases, K.B. and S.C.

An additional referral from October of 2012 indicated that N.C.-2 was admitted to a local hospital after setting a fire in the home. The referral indicated that it was not the first fire that the child had set. According to petitioner, the then four-year-old child had obtained lighters from her purse. A referral in January of 2014 indicated that police arrived at petitioner's home and the children did not know where their mother was and were unable to contact her. In September of 2018, CPS received a referral that the children were again found home alone and that petitioner's home was in disarray.

According to the petition, another referral was made by a CPS worker to service provider Children First in April of 2020 for safety services, but petitioner again refused to cooperate and threatened to sue CPS, stating she would not allow any service provider in her home. The DHHR alleged that CPS workers arrived at petitioner's home that month and found N.C.-1, N.C.-2, and S.C. home alone. Thirteen-year-old S.C. was unable to tell CPS workers where petitioner worked, but the child denied that petitioner was abusing controlled substances or staying out late. The CPS worker left petitioner a voicemail. The DHHR alleged that petitioner returned the call and screamed that she would not engage with CPS and that they were not allowed back in her home. The CPS worker interviewed twelve-year-old N.C.-1 at the home, and the child disclosed that there was conflict among the family because K.B., not at issue on appeal, contacted CPS about conditions in the home. The child disclosed that petitioner told her that it was K.B.'s fault and that K.B. was attempting to leave the home because she was unhappy with petitioner. N.C.-1 also denied that petitioner drinks alcohol but did admit that she came home drunk early one morning after being out with a friend. N.C.-1 also disclosed that she occasionally gets scared when left home alone and goes to another home when they run out of food. According to the petition, twelve-year-old N.C.-2 disclosed that she had been home with just her siblings overnight and that petitioner returned home early in the morning, only long enough to prepare for work. N.C.-2 claimed she was not frightened by petitioner's absence but acknowledged that petitioner occasionally consumed alcohol. The DHHR alleged that a CPS worker interviewed petitioner who was "extremely hostile." Petitioner blamed K.B. for the referral and indicated that the child was upset because she would not let the child's boyfriend live with them. Petitioner indicated that it

was seventeen-year-old K.B.'s job to cook for the children while petitioner was out of the home. Petitioner stated that she worked from 9:00 or 10:00 am until 7:00 or 9:00 pm each weeknight. Petitioner acknowledged smoking marijuana two weeks prior to the interview but denied other drug use. Petitioner also acknowledged consuming alcohol but denied being an alcoholic; she refused to answer further questions about her alcohol consumption. Petitioner admitted leaving her thirteen-year-old son and twelve-year-old daughters home alone but stated it was a Sunday night and that she came home at 5:00 am on Monday morning. Petitioner refused to discuss the "white powder" that K.B. found in petitioner's cigarette case but stated that the children had phones and knew how to dial 9-1-1.

In May of 2020, the circuit court held a preliminary hearing wherein petitioner moved for services to be provided to her. The DHHR and guardian objected to the motion, citing petitioner's refusal to participate in services throughout the preceding years, including in the months before the instant petition was filed. The court expressed "great concerns with the 15-year CPS history with the family and [petitioner]'s constant refusal to participate in family services" and denied the motion. The court ordered petitioner to participate in a parental fitness evaluation and random drug and alcohol screens. The court also barred petitioner from contact with the children and ordered her to provide child support.

The circuit court held a hearing in August of 2020 wherein the guardian moved to conduct an in camera interview of K.B., which the court granted. The circuit court also granted petitioner's motion for visitation—contingent on providing consecutive negative drug screens—and her motion for parenting and adult life skills services. In October of 2020, the circuit court held an adjudicatory hearing wherein the DHHR moved to dismiss S.B. and K.B. from the proceedings as they reached the age of majority, which the court granted. Petitioner moved to continue the hearing after receiving the parental fitness evaluation that morning. Petitioner also moved to reinstate visitation if her marijuana level continued to decline, which the court granted.

The circuit court held the continued adjudicatory hearing in November of 2020. At the hearing, the circuit court granted the DHHR's motion to consider all prior evidence for purposes of adjudication. The DHHR then moved to introduce K.B.'s in camera testimony. After hearing objections to the motion, the court ordered that the transcript of K.B.'s testimony be prepared, that it be filed under seal, and that it could only be viewed by this Court in the event of an appeal.

After the motions, the DHHR presented Dr. Megan Green from Hudson Forensics to testify about the forensic psychological evaluation she performed. Dr. Green testified that she evaluated petitioner and provided a "poor" prognosis for petitioner attaining minimally adequate parenting within an acceptable time frame. Dr. Green testified that petitioner denied all referral concerns and stated that she only became involved with CPS because K.B. lied about her parenting. Dr. Green testified that petitioner was unwilling to admit to any personal faults but engaged in "scapegoating" her older daughter instead.

After Dr. Green, a service provider testified as to petitioner's drug screens. The service provider testified that petitioner tested positive for cocaine in July of 2020 and additional controlled substances in September of 2020. The service provider testified that petitioner's visitation with the children was stopped and restarted several times due to her inability to

consistently pass her drug screens. Next, petitioner testified that she was participating in services, including drug screens and parenting classes. Petitioner also testified that she stopped using marijuana and that her most recent drug screen was negative for all drugs. Petitioner acknowledged that she had verbal altercations with her oldest child, K.B., about the child watching the younger children while petitioner worked. Petitioner also testified that she would attend individualized or family therapy, if needed. On cross-examination, petitioner denied that K.B. found white powder in her car and stated the child was lying. Petitioner also moved for a post-adjudicatory improvement period.

After petitioner's testimony, the circuit court granted a motion by the guardian to take judicial notice of the family's lengthy history with CPS and past and ongoing juvenile delinquency/youth services cases involving K.B. and S.C. Following the presentation of evidence, the circuit court found that petitioner demonstrated minimal acceptance of responsibility for her actions and continued to blame others. The court also found that petitioner failed to supervise the children or provide them with adequate housing; engaged in substance abuse; caused the children educational neglect; and was non-compliant with offered services and "even indignan[t] regarding these matters." As such, the court adjudicated petitioner as an abusing and neglecting parent and denied her motion for a post-adjudicatory improvement period.

In January of 2021, the guardian submitted a report for the circuit court's consideration at disposition, including findings from psychological evaluations of N.C.-1 and N.C.-2. According to the report, N.C.-1 disclosed a history of trauma, which began when she was just four or five years old after she was sexually assaulted by a male cousin and by her father, whose parental rights were terminated in a prior proceeding. The child reported during the evaluation that she is unable to avoid triggers that remind her of her past traumatic experiences and that she tends to have nightmares, intrusive thoughts, and anxiety symptoms. The child also disclosed that, when she was younger, she was hospitalized for one week after engaging in self-harming behavior. The child stated that she never had any other mental health treatment while in petitioner's care. N.C.-2 also reported suffering from symptoms of depression, which began when she was very young, as well as anxiety and crying spells. Finally, N.C.-2 disclosed that she was hospitalized for one week after accidentally lighting a large fire while playing with matches as a young child. In her report, the guardian recommended that the circuit court terminate petitioner's parental rights.

Later that month, the circuit court held a dispositional hearing wherein petitioner moved the court to continue the matter and for the court to conduct in camera interviews with N.C.-1, N.C.-2, and S.C. While petitioner testified in support of her motion, the DHHR and guardian objected. The circuit court ultimately denied petitioner's motion, finding that the children had already participated in recent psychological evaluations and received post-traumatic stress disorder diagnoses. The court found that the potential psychological harm to the children by conducting in camera interviews outweighed any benefit to the court in ruling on disposition. The circuit court also granted a motion by the DHHR for the court to consider all prior evidence for disposition.

Next, a DHHR case manager testified that she recommended petitioner's parental rights be terminated. The case manager indicated that petitioner failed to acknowledge any deficiencies in her parenting throughout the proceedings, even after being adjudicated as an abusing and neglecting parent. The case manager also testified that the children had benefited since their

removal from petitioner's custody, including attending therapy and regularly attending school. The case manager further indicated that the children expressed no desire to return to petitioner's home and wondered why petitioner used drugs. On cross-examination, the case manager acknowledged that petitioner was employed, had housing, and had participated in recent drug screens. Finally, the case manager did not recommend that the court grant petitioner any post-termination visitation with the children. Petitioner testified that she had obtained employment and housing, was taking prescribed depression medication, and had participated in recent drug screens. Petitioner also testified that some past drug screens, including screens that were positive for methamphetamine, amphetamine, and cocaine, were false positives.

After the presentation of evidence, the circuit court found that petitioner had not followed through with rehabilitative services, as evidenced by the continuation of conditions which threatened the health, welfare, and lives of the children. Additionally, the court found that there was no reasonable likelihood that petitioner could substantially correct the conditions of abuse and neglect and that termination of her parental rights was necessary for the children's welfare. Therefore, the court terminated petitioner's parental rights.[3] It is from the circuit court's January 28, 2021, dispositional order that petitioner appeals.

The Court has previously established the following standard of review:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner first argues that the circuit court erred in terminating her parental rights without giving her additional time to participate in an improvement period. While petitioner acknowledges that "the circuit court has discretion to grant, extend, or terminate an improvement period," she argues that granting her services during the proceedings "contradicts the circuit court's position that services for an improvement period would not be beneficial." Petitioner further argues that she demonstrated to the circuit court that she recognized her substance abuse issues, including her prior marijuana usage. In light of this, she argues that she should have been afforded the opportunity to participate in an improvement period. We disagree.

---

[3]The father's parental rights were terminated during a prior proceeding. The permanency plan for the children is adoption with their current foster family.

West Virginia Code § 49-4-610(2)(B) provides that the circuit court may grant a parent a post-adjudicatory improvement period when the parent "demonstrates, by clear and convincing evidence, that the [parent] is likely to fully participate in the improvement period." "This Court has explained that 'an improvement period in the context of abuse and neglect proceedings is viewed as an opportunity for the . . . parent to modify his/her behavior so as to correct the conditions of abuse and/or neglect with which he/she has been charged.'" *In re Kaitlyn P.*, 225 W. Va. 123, 126, 690 S.E.2d 131, 134 (2010) (citation omitted). However, the circuit court has discretion to deny an improvement period when no improvement is likely. *In re Tonjia M.*, 212 W. Va. 443, 448, 573 S.E.2d 354, 359 (2002). Further, we have previously held that

> [i]n order to remedy the abuse and/or neglect problem, the problem must first be acknowledged. Failure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect or the perpetrator of said abuse and neglect, results in making the problem untreatable and in making an improvement period an exercise in futility at the child's expense.

*In re Timber M.*, 231 W. Va. 44, 55, 743 S.E.2d 352, 363 (2013) (citation omitted).

Contrary to petitioner's argument, we find no error in the circuit court's determination that petitioner was not likely to fully participate in an improvement period. The circuit court found that petitioner failed to acknowledge or take responsibility for the conditions that led to the abuse and neglect of the children. Specifically, petitioner continued to deny that she abused and neglected the children throughout the proceedings, instead blaming K.B. or CPS workers. While petitioner argues that she proved she was likely to participate in an improvement period by being willing to participate in parenting classes and visiting with the children, these actions alone could not have been successful without petitioner's recognition of her abuse and neglect of the children. Further, petitioner only began participating in services during the proceedings after the DHHR filed an abuse and neglect petition. Petitioner previously and repeatedly rejected various safety plans and offers from CPS workers over a fifteen-year period prior to the instant proceedings. Finally, petitioner's visitation with the children was suspended at various points during the proceedings due to her positive drug screens for cocaine, marijuana, and methamphetamine. Given this evidence, we find no error in the circuit court's decision to deny petitioner a post-adjudicatory improvement period.

Next, petitioner argues that the circuit court erred in denying her motion for in camera interviews of the children. Petitioner contends that the circuit court only heard testimony through an in camera interview with K.B., who had a contentious relationship with petitioner. Petitioner argues that the children had spoken positively about their relationship with her and that "the rebuttable presumption of Rule 8 of the West Virginia Rules of Procedures for Abuse and Neglect Proceedings had been overcome, allowing for the children to provide in camera testimony." We find petitioner's argument without merit.

According to Rule 8(a) of the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings,

there shall be a rebuttable presumption that the potential psychological harm to the child outweighs the necessity of the child's testimony and the court shall exclude this testimony if the potential psychological harm to the child outweighs the necessity of the child's testimony. Further, the court may exclude the child's testimony if (A) the equivalent evidence can be procured through other reasonable efforts; (B) the child's testimony is not more probative on the issue than the other forms of evidence presented; and (C) the general purposes of these rules and the interest of justice will best be served by the exclusion of the child's testimony.

The record here is clear that the children were not required to testify because equivalent evidence was available through psychological evaluations of the children. While petitioner alleges that the children had "previously spoken positively" about her to the DHHR and guardian, the circuit court was able to rely on the psychological evaluations to draw conclusions about the children's relationships with petitioner.

In the psychological evaluations, N.C.-1 reported a history of trauma, which began when she was just four or five years old after she was sexually assaulted by a male cousin and by her father. The child reported during the evaluation that she is unable to avoid triggers that remind her of her past traumatic experiences and that she tends to have nightmares, intrusive thoughts, and anxiety symptoms. The child also disclosed that she had been hospitalized for one week when she was young after engaging in self-harming behavior. The child stated she never had any other mental health treatment while in petitioner's care. N.C.-2 also reported suffering from symptoms of depression which began when she was very little as well as anxiety and crying spells. N.C.-2 disclosed that she stayed at a local hospital for a week after accidentally lighting a large fire while playing with matches as a young child. Finally, S.C. was involved in other court proceedings, including an ongoing youth services case. As such, Rule 8(a) gives the circuit court discretion to refuse to force a child to testify, which it properly exercised below. Given the extensive traumatic experiences the children recounted at length in their psychological evaluations and other proceedings before the court, the probative value of the testimony could not outweigh the presumed harm to the children. As such, we find no error in the circuit court's refusal to grant petitioner's motion to require such testimony.

Lastly, petitioner takes issue with the timeframe from adjudication to termination, arguing that she should have been given additional time and an opportunity to demonstrate that she could correct the conditions of abuse and neglect. However, we have previously held that "[c]ourts are not required to exhaust every speculative possibility of parental improvement . . . where it appears that the welfare of the child will be seriously threatened." *Cecil T.*, 228 W. Va. at 91, 717 S.E.2d at 875, syl. pt. 4, in part (citation omitted). Further, we have held that

"[t]ermination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, [West Virginia Code § 49-4-604] may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under [West Virginia Code § 49-4-604(d)] that conditions of neglect or abuse can be substantially corrected." Syllabus point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

Syl. Pt. 5, *In re Kristin Y.*, 227 W. Va. 558, 712 S.E.2d 55 (2011). Here, the circuit court made the appropriate findings based upon substantial evidence. On appeal, petitioner cannot establish that these findings were in error. As such, we find no error in the termination of petitioner's parental rights.

For the foregoing reasons, we find no error in the decision of the circuit court, and its January 28, 2021, order is hereby affirmed.

Affirmed.

**ISSUED**: October 13, 2021

**CONCURRED IN BY**:

Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton